**In re Robert J. BABO and Arlene L. Babo, His Wife, Debtors.**

**Vedder J. WHITE, Esq., Trustee, Plaintiff,**

v.

**Robert J. BABO and Hammermill Thrift Plan Trust, Defendants.**

Bankruptcy No. 85–00448E.
Adv. No. 86–0015.

United States Bankruptcy Court,
W.D. Pennsylvania.

Feb. 28, 1989.

Vedder J. White, Erie, Pa.

John P. Kreis, Los Angeles, Cal.

Michael S. JanJanin, Erie, Pa.

### MEMORANDUM AND ORDER

WARREN W. BENTZ, Bankruptcy Judge.

This matter is before the Court on the motion of Hammermill Thrift Plan ("Hammermill" or the "Plan") for reconsideration of the Opinion and Order previously entered by this Court on January 20, 1988. *White v. Babo (In re Babo)*, 81 B.R. 389 (Bankr.W.D.Pa.1988). Hearing on this cause was held on the 10th day of May, 1988.

Hammermill's motion, based on three primary contentions, argues that the January 20, 1988 Order:

1) Is an impermissible exercise of *in rem* jurisdiction over the assets of the plan;

2) Disregards the spendthrift nature of the plan; and

3) Imperils the tax exempt status of the plan (implying that even if the debtor's interest in the Plan is a bankruptcy estate asset, the bankruptcy court should allow the debtor to retain it, because to do otherwise would endanger the benefits of the other participants of the Plan).

Hammermill argues that enforcement of the Order would be tantamount to this Court exercising *in rem* jurisdiction over the assets of the Plan when jurisdiction over matters relating to the assets of the Plan is vested exclusively in the district courts under 29 U.S.C. § 1132(e)(1). Hammermill failed to raise this objection in the first instance, but we will nevertheless consider it. We find this argument, however, to be without merit. The trustee's complaint for turnover is explicitly a core proceeding under 28 U.S.C. § 157(b)(2)(E). Our exercise of *in rem* jurisdiction extends

to the estate of the debtor which includes all legal and equitable interests in property. *See* 11 U.S.C. § 541. We also note that 29 U.S.C. § 1132(e)(1) merely vests district courts and state courts with concurrent jurisdiction over actions brought by a participant or beneficiary "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §§ 1132(a)(1)(B) and (e)(1). It does not preclude bankruptcy court jurisdiction over property rights of the debtor which is conferred by 28 U.S.C. § 157.[1]

Hammermill also argues that, even assuming that the "applicable non-bankruptcy law" in 11 U.S.C. § 541(c)(2) means state law, we have disregarded the spendthrift nature of the Plan and Pennsylvania case law which recognizes pension plans as spendthrift trusts. We initially uphold the previous finding that "applicable non-bankruptcy law" referred to in § 541(c)(2) means state spendthrift trust law. This view is in accord with the majority of cases that have addressed the issue. *See In re Cook,* 43 B.R. 996 (N.D.Ind.1984); *In re Hysick,* 90 B.R. 770 (Bankr.E.D.Pa.1988); *B.K. Medical Systems, Inc. v. Roberts (In re Roberts),* 81 B.R. 354, 374 (Bankr.W.D. Pa.1987); *In re Kerr,* 65 B.R. 739 (Bankr. D.Utah 1986); *Nixon v. P.J. Pedone & Co. (In re Nichols),* 42 B.R. 772 (Bankr.M.D. Fla.1984); and *In re Berndt,* 34 B.R. 515 (Bankr.N.D.Ind.1983).

Our prior Order and Opinion recognized that a true spendthrift trust is valid under Pennsylvania law. Hammermill asserts that our prior Opinion and Order disregards the validity of the spendthrift provisions under Pennsylvania law and cites as authority *Lowe v. Jones,* 414 Pa. 466, 200 A.2d 880 (1964) and *In re Borsch's Estate,* 362 Pa. 581, 67 A.2d 119 (1949). We recognize that, under the authority of *In re Borsch's Estate,* 362 Pa. 581, 67 A.2d 119 (1949), certain spendthrift trusts are valid in Pennsylvania. We also find that the *Lowe* decision is consistent with our prior Opinion and Order.

In *Lowe,* a creditor attempted to attach a retired debtor's pension payments that were due from a trust fund established by the employer. The trust fund contained spendthrift provisions and was funded solely by contributions of the employer. Cognizant of the fact that Pennsylvania law does not recognize nor permit wage attachments, the *Lowe* court stated that pensions were deferred compensation for services already rendered. 200 A.2d 880, 881–82 (1964). Thus, the court held that an individual's pension "would no more be attachable than his wages would have been." *Id.* at 881. This facet of the case however, does not address the spendthrift nature of a pension plan.

As an alternative holding, the *Lowe* court examined the provisions of the pension agreement which prohibited alienation or attachment and upheld the spendthrift nature of the pension agreement. *Id.* 200 A.2d at 882. Our prior holding is consistent with this portion of the *Lowe* decision. The pension agreement in *Lowe* would still qualify as a valid spendthrift trust today. The pension at issue was non-contributory and provided that, "prior to his retirement under conditions of eligibility for pension benefits," the employee did not "have any right or interest in or to any portion of any funds" which were paid into the pension trust. *Id.* 200 A.2d at 881. Unlike the Plan at issue here, the employee did not have any access to or control over the trust assets prior to his planned retirement.

As we indicated in our prior Opinion and Order, it would violate public policy to enforce the spendthrift provisions of the Plan at issue here. Although the debtor herein did not actually draft the Plan, he is a *de facto* settlor of that portion of the Plan designated as the Fixed Income Fund. *See* Articles II, III and V and Section 1.12 of the Plan. A brief analysis of the Plan sustains this finding. Section 2.01 provides that an employee may elect to participate in

---

1. *See also In re Witte,* 92 B.R. 218 (Bankr.W.D. Mich.1988) (Bankruptcy court has jurisdiction to determine whether distribution from the debtor's profit sharing plan to a creditor would deprive the plan of ERISA qualification.)

the Plan "by executing the appropriate form authorizing an amount of payroll deductions or reduction from his Salary in accordance with the provisions of Article III. Once the employee elects to participate and authorizes the reduction from his salary, Section 3.01 of the Plan provides that "[t]he percentage of the monthly Salary so designated for reduction is hereinafter referred to as the Participant's 'Deferred Compensation Savings'." Section 5.01 of the Plan then states that "All Participants' Contributions, including Deferred Compensation Savings, Basic Savings and Supplemental Savings, shall be invested in the Fixed Income Fund." As illustrated by the terms of the Plan, the employee (debtor) has the option whether to place part of his earnings in the Fixed Income Fund, or to take it in cash. There is no gratuity from the employer as to this part of the Plan. *See Lowe v. Jones,* 414 Pa. 466, 200 A.2d 880 (1964).

Although our prior Opinion and Order quoted language from the Summary Plan Description, we find no error requiring a change in the decision. The language of the Plan is nearly identical. The Plan states in Section 10.01 through Section 10.03:

*Section 10.01.* A Participant may ... withdraw in the following order, all or such part, as is selected by the Participant, of:

(a) the actual dollar amount of the Participant's Contributions which is held in the Supplemental Savings portion of the Fixed Income Fund as of such Valuation Date, or, if less, the market value thereof; and

(b) subject to the consent of the Plan Administrator as provided in Section 10.03:

(i) the actual dollar amount of the Participant's Contributions which is held in the Basic Savings portion of the Fixed Income Fund as of such Valuation Date, or, if less, the market value thereof;

(ii) the amount standing to his credit in the Supplemental Savings portion of the Fixed Income Fund as of such Val-

uation Date, which represents the earnings credited to his Supplemental Savings held therein;

(iii) the amount standing to his credit in the Basic Savings portion of the Fixed Income Fund as of such Valuation Date which represents the earnings credited to his Basic Savings held therein;

(iv) the actual dollar amount of contributions made on behalf of the Participant which is held in the Deferred Compensation Savings portion of the Fixed Income Fund as of such Valuation Date, and all earnings thereon, or, if less, the market value thereof ...

*Section 10.02.* A Participant who withdraws all or a part of his Supplemental, Basic or Deferred Compensation Savings, or earnings thereon, may continue to make contributions to the Plan under Article III hereof.

*Section 10.03.* Withdrawals of amounts from the Fixed Income Fund pursuant to Section 10.01(b) shall be made only upon the consent of the Plan Administrator, which shall be granted at the sole discretion of the Plan Administrator in a uniform, non-discriminatory manner based upon a demonstration by the Participant of an immediate and heavy financial need for which funds are not reasonably available from other resources of the Participant, including but not limited to, the purchase of a residence, significant capital improvements to an existing residence, payment of expenses of higher education of dependents, unusual medical or dental expenses not covered by insurance payments, or other financial needs as the Plan Administrator may deem appropriate at the time a withdrawal is requested. The amount of any permitted withdrawal shall be based entirely upon the Plan Administrator's decision, but in no event may such withdrawal exceed the amount required to satisfy such Participant's demonstrated financial need. In no event shall a Participant be permitted to make a withdrawal from the Stock Fund while he is employed, whether vested or unvested (sic).

As we stated previously, the employee has a right to demand a distribution that can not be refused so long as he fits the express criteria contained in § 10.03 of the plan. *Levitt v. Billy Penn Corp.*, 219 Pa. Super. 499, 283 A.2d 873 (1971) ("The employee has a contractual right to enforce the plan according to its terms, and such benefits may not be denied arbitrarily. Even where words such as 'absolute discretion' are used ..."); *See also* Section 16.02 of the plan ("Neither the Plan Administrator nor the Corporate Pension and Welfare Plan Committee shall have the power to add to, subtract from or modify the terms of the Plan or change or add to any benefits provided by the Plan or to waive or fail to apply any requirements of eligibility for benefits under the Plan.") The debtor retains sufficient incidents of ownership and control over the portion of the Plan designated as the Fixed Income Fund that to enforce the spendthrift provisions would violate public policy. *See In re Mogridge's Estate*, 342 Pa. 308, 20 A.2d 307 (1941) (Spendthrift trust provisions are unenforceable as a violation of public policy when the beneficiary retains the beneficial incidents of ownership). We therefore find that the findings of fact and conclusions of law contained in our prior Opinion and Order are correct and in accord with Pennsylvania's spendthrift trust law.

Hammermill's last contention centers on the effect of our decision. Hammermill asserts that compliance with our prior Opinion and Order will jeopardize the tax exempt status of the Plan and therefore will endanger the benefits of the remaining participants in the Plan. The implication is that this Court should not enforce 11 U.S.C. § 541 as to the debtor, because it would adversely affect the Plan's other participants. As authority, Hammermill cites a Private Letter Ruling (81–31020 May 5, 1981) issued by the Internal Revenue Service. The sum and substance of this letter ruling was that Internal Revenue Service believed that a pension plan would lose its tax qualified status under the Internal Revenue Code if the plan complied with a bankruptcy court order which directed the plan to turnover a percentage of the monthly payments that represented a Chapter 13 debtor's interest in the plan. No other authority has been cited to advance Hammermill's position that tax qualification consequences should be a factor in deciding whether the debtor's interest in the Plan is property of the estate.

The trustee asserts that the tax consequences are irrelevant to our decision and that the issue was raised as an equitable argument. In support, the trustee directs our attention to *Firestone v. Metropolitan Life Ins. Co. (In re DiPiazza)*, 29 B.R. 916 (Bankr.N.D.Ill.1983) and *Gray v. Ingles Markets, Inc. (In re DeWeese)*, 47 B.R. 251 (Bankr.W.D.N.C.1985). In both of these cases, the court addressed the tax disqualification issue as well as the Private Letter Ruling. In *DiPiazza*, the court stated:

Addressing this argument, this court notes that ERISA Section 1144(d) provides in relevant part that "Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair or supercede (sic) any law of the United States ..." 29 U.S.C. § 1144(d)(1979). Since this court has ruled that the ERISA plans in question do not fall under the exceptions permitted by Section 541(c)(2), the normal anti-alienation requirements of ERISA conflict with § 541(c)(1)(A) of the Bankruptcy Code ... Consequently, this court holds that to the extent that the provisions of the Bankruptcy Code and ERISA conflict, § 541(c)(1)(A) implicitly amends the normal anti-alienation provisions of ERISA. *Id.* at 923.

The *Deweese* court also found that ERISA's anti-alienation clause was implicitly repealed with respect to bankruptcy. 47 B.R. 251, 256 (Bankr.W.D.N.C.1985) (citing *DiPiazza* with approval.) Similarly, in *Regan v. Ross*, the Second Circuit Court of Appeals held that "to the extent Congress evidenced a clear intent to include pension benefits in the property of a Chapter 13 estate, it necessarily amended § 401(a)(13) and applicable Treasury Regulations accordingly." 691 F.2d 81, 87 (2d Cir.1982).

We agree with these decisions and believe this to be a correct application of the

law. Accordingly, we find Hammermill's last contention to be without merit.

It is therefore ORDERED, ADJUDGED, AND DECREED that the motion of Hammermill for reconsideration of this Court's prior Opinion and Order is hereby denied.